**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BERING STRAIT CITIZENS FOR
RESPONSIBLE RESOURCE
DEVELOPMENT; SUSAN STEINACHER;
JANA VARRATI,
            *Plaintiffs-Appellants,*

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; KEVIN J. WILSON,
District Engineer, U.S. Army
Corps of Engineers; ALASKA GOLD
COMPANY,
            *Defendants-Appellees.*

No. 07-35506

D.C. No.
CV-07-00057-RRB

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
September 26, 2007—Seattle, Washington

Filed January 3, 2008
Amended April 30, 2008

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Victoria Clark, Brian Litmans, Trustees for Alaska, Anchorage, Alaska; Roger Flynn, Jeffrey C. Parsons, Western Mining Action Project, Lyons, Colorado, for plaintiffs-appellants Bering Strait Citizens for Responsible Resource Development, Susan Steinacher and Jana Varrati.

Ronald J. Tenpas, Acting Assistant Attorney General, Ryan D. Nelson, Deputy Assistant Attorney General, Dean K. Dunsmore, Luther L. Hajek, Daniel Pinkston, Jennifer L. Scheller, Lisa E. Jones, Attorneys, United States Department

of Justice, Environment & Natural Resources Division, Washington, D.C., for defendant-appellees United States Army Corps of Engineers and Colonel Kevin J. Wilson.

Michael A. Grisham, Dorsey & Whitney LLP, Anchorage, Alaska, for defendant-intervenor Alaska Gold Company.

## ORDER

The opinion filed on January 3, 2008 and published at 511 F.3d 1011 (9th Cir. 2008), is AMENDED as follows. The sixth sentence of the final paragraph in section V-B-1 states:

> The impact of isolated placer mining, which often involves only small-scale operations, in our view is not germane to the cumulative impacts assessment of the Rock Creek Mining Project.

That sentence is deleted in its entirety and replaced with the following language:

> The Corps also considered the cumulative impact of placer mining in the region. In our view, the impact of the isolated, small-scale placer mining that exists in the Nome region today is not germane to the cumulative impacts assessment of the large-scale hard rock mining project at issue here. In addition, we understand that reclamation is required at the end of placer mining projects. *See* Alaska Stat. § 27.19.020. Because nearly all of the Nome district has been previously mined, much of it prior to the introduction of reclamation requirements, any new placer mining projects will result in remediation of historic mining impacts.

The panel has unanimously voted to deny the petition for panel rehearing. Judges Kleinfeld and Gould voted to deny

the petition for rehearing en banc, and Judge Fletcher has so recommended. The petition for en banc rehearing has been circulated to the full court, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35(b). The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for rehearing or rehearing en banc will be accepted.

**IT IS SO ORDERED.**

---

## OPINION

GOULD, Circuit Judge:

This appeal concerns a permit issued to Defendant-Appellee Alaska Gold Company ("AGC"), by Defendant-Appellee Army Corps of Engineers ("the Corps") for a major gold-mining project near Nome, Alaska. The permit was issued pursuant to Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, which authorizes the Corps to issue permits for the discharge of dredged or fill material into the navigable waters of the United States.

The project, known as the "Rock Creek Mine Project," would consist of two open-pit gold mines at separate locations outside of Nome, plus facilities built for recovering and processing gold ore. Once the project is commenced, about 15,592,411 cubic yards of fill from the mine will be placed in wetlands totaling 346.5 acres.

Plaintiffs-Appellants Bering Strait Citizens for Responsible Resource Development, Susan Steinacher, and Jana Varrati (collectively, "BSC"), allege that the Corps violated the CWA and the National Environmental Policy Act ("NEPA") by granting a permit for the Rock Creek Mine Project. BSC appeals the district court's denial of its motion for a tempo-

rary restraining order and a preliminary injunction, and the district court's dismissal of the suit on summary judgment. We conclude that the Corps complied with the requirements of the CWA and NEPA, and affirm the judgment of the district court.

# I

## A

The Rock Creek Mine Project is a project of Defendant-Appellee AGC. It has a projected life of four to five years and is expected to process 7,000 tons of gold ore per day when operable. The complete project consists of two sites. The first, the "Rock Creek Mine/Mill," lies six miles north of Nome, Alaska in the Snake River watershed. When completed, the Rock Creek Mine/Mill site would consist of a fifty-acre open pit gold mine, a gold recovery plant, a paste tailings storage facility, two non-acid generating development rock stockpiles, a facility for crushing and processing the gold ore, and buildings used for storage and maintenance purposes.

The second facility, the "Big Hurrah Mine," lies 42 miles east of Nome, Alaska. When completed, the Big Hurrah Mine would consist of a 22-acre open pit gold mine, ore stockpiles, and additional buildings for storage and maintenance purposes. Ore from the Big Hurrah Mine would be trucked to the Rock Creek Mine/Mill site for processing, so the Big Hurrah Mine would not include processing or tailings storage facilities. Both sites are controlled by AGC, through outright ownership or through leases from local Native corporations.

The sites of both the Rock Creek Mine/Mill and the Big Hurrah Mine were historically mined and contain debris and tailing piles from earlier mining activities. At the Rock Creek Mine/Mill site, rock stockpiles from previous mining operations now occupy 62 acres of wetlands. At the Big Hurrah Mine, the area that would become the open pit mine at this

time contains tailings from previous gold mining activities, and Big Hurrah Creek (adjacent to the Big Hurrah Mine) contains tailings that have diverted the creek from its natural path.

Both sites figured prominently in Alaska's early "gold rush" history, commencing late in the nineteenth century. Technological advances and current gold prices have rendered the mining claims economic once more, and impelled the evaluation of prospective development combined with rehabilitation of the sites. The Corps and AGC hope for an economic advantage and environmental improvement as a result. AGC observes that Nome has unemployment rates over twice the state average and that the region currently offers limited opportunities for economic development, and the Corps considered the region's economic conditions when assessing the permit.

The construction and operation of the Rock Creek Mine Project will result in the permanent destruction of 346.5 acres of existing wetlands. Most of these wetlands are located at the Rock Creek Mine/Mill site, where two rock stockpiles, the tailings storage facility, and other facilities would be constructed in existing wetlands. Development of the Big Hurrah Mine would destroy five acres of existing wetlands to widen and improve the existing road to the Big Hurrah Mine.

The permit issued by the Corps requires measures to mitigate environmental damage from this project and earlier mining activities at the sites. At the Rock Creek Mine/Mill, these measures include the removal of the rock stockpiles from existing wetlands for placement in newly-constructed storage facilities, the reclamation of wetlands disturbed by previously constructed water-management systems, and the conversion of the mining pit to a pit lake (i.e. the mining pit will be filled with water). At the Big Hurrah Mine, these measures include the use of historic waste rock for improvements to the Big Hurrah access road, the removal of tailings from the Big Hur-

rah Creek flood plain to restore the natural flow of the creek, and the conversion of the mining pit to a pit lake. The Corps calculates that these mitigation measures will result in the reclamation of 106 acres of previously-disturbed wetlands and the creation of 70 acres of new wetlands. Taking these mitigation measures into account, the Rock Creek Mining Project will result in a net loss of 170.5 acres of wetlands.

**B**

AGC applied for a permit from the Corps for the Rock Creek Mine Project in May, 2006. The Corps posted a public notice describing the project on its website on June 1, 2006. The notice included information about a public meeting to be held in Nome on June 26, 2006, and the notice was delivered in electronic or hard-copy format to federal, state, and local agencies, the community of Native Alaskans residing in or near Nome, the City of Nome, the neighboring community of Solomon, adjacent property owners, the Nome Postmaster, and any member of the community who requested a copy.

In response to the Corps' request for comment, the Environmental Protection Agency ("EPA") requested a thirty-day extension of the comment period. The Corps responded by granting a twenty-day extension. EPA said that it did not have sufficient information to conclude that the project met the requirements of the CWA. Specifically, EPA argued that the project did not appear to be the least damaging practicable alternative, that information regarding mitigation measures and the closure of the site provided by AGC was incomplete, that the Corps had not adequately considered the cumulative effects of all potential mining activities in the area, and that the project did not adequately consider naturally-occurring damage to wetlands in the area. EPA's response also included a list of seven conditions that it wanted included in any permit for the project.

The U.S. Fish and Wildlife Service ("USFWS") joined EPA's request for an extension of the comment period and gave proposed conditions to be added to the permit. Along with a series of highly specific site-design conditions,[1] USFWS proposed a permit condition that requires AGC to "work with the Corps, the [USFWS], the EPA, and the [Alaska Department of Natural Resources] to identify additional mitigation opportunities in the project area that will benefit birds."

Local agencies, organizations, and individuals also responded to the request for comment. The City of Nome[2] asked for additional study of the project. Business organizations, including the Nome Chamber of Commerce, supported the project, while many scientific and environmental organizations opposed the project or requested additional study.[3] In addition to these agencies and organizations, thirty-four companies and forty-five individuals wrote in support of the project, while seven individuals opposed it.

In August, 2006, the Corps issued a permit for the Rock Creek Mine Project. Thereafter, Plaintiff-Appellants BSC filed suit in the United States District Court for the District of Alaska challenging the permit. In December 2006, the Corps

---

[1]For example, condition three concerns the culvert size used in the construction of the mine access road, and condition 6 concerns the use of "bird diverter devices" on power lines in the project area.

[2]The City of Nome, Alaska has a population of about 3,500 people.

[3]The Resource Development Counsel and the Alaska Miners Association, Inc. both supported the project on account of its expected economic benefits. The Center for Science and Public Participation expressed concerns about the reclamation plan for the project and made specific recommendations about the reclamation plan. Trustees for Alaska, on behalf of the Northern Alaska Environmental Center, the Alaska Center for the Environment, and others, argued that the Corps' public notice procedures were inadequate and that the environmental impacts of the project were both understated and more significant than the economic benefits of the project.

withdrew the permit, informing AGC that the Corps needed additional time to confirm that the Permit Evaluation and Decision Document ("PEDD")—the document on which permitting decisions are based—was factually complete, accurate, and consistent with applicable law. The Corps then moved for a voluntary remand, which the district court granted.

## C

In February 2007, the Corps issued a revised PEDD for the Rock Creek Mine Project. The revised PEDD reviewed the comments received on the project, the environmental consequences of the project, and the alternative project designs considered. The Corps adopted the seven conditions proposed by the EPA, but dismissed the EPA's concerns about the analysis of alternatives, cumulative impacts, and natural events. The Corps also adopted USFWS's recommendations, including the requirement that AGC discuss additional mitigation opportunities with the Corps and USFWS after the project is underway. An Environmental Assessment ("EA") and a "Finding of No Significant Impact ("FONSI") are also included in the PEDD pursuant to 40 C.F.R. § 1508.9. Because of the FONSI, the Corps determined that it was not required to prepare an Environmental Impact Statement ("EIS") for the project.

On March 13, 2007, the Corps issued a new permit for the project. On April 18, 2007, BSC filed a second complaint in the district court challenging the Rock Creek Project and seeking a preliminary injunction and a temporary restraining order to prevent the project from moving forward. The district court denied the motions for a preliminary injunction and for a temporary restraining order, and dismissed the suit with prejudice in a June 8, 2007, opinion. The district court concluded that the Corps properly considered the relevant factors required under the CWA and NEPA, and that it was unlikely that additional study would have changed the Corps' view on

the project. Also, the district court concluded that no injunctive relief was justified because most of the relevant wetlands were filled during the weeks that passed between the Corps' issuance of the second permit and the filing of BSC's second complaint.

On June 14, 2007, the district court issued an amended opinion clarifying its intention to convert the plaintiffs' motion for a temporary injunction and for a temporary restraining order into a motion for summary judgment, and correcting a factual error in the June 8, 2006 opinion.[4]

On July 5, 2007, BSC filed an emergency motion for an injunction pending appeal. That motion was denied on July 27, 2007. This appeal followed.

## II

We review de novo a district court's decision to grant summary judgment. *Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). The Corps' factual determinations are reviewed under the arbitrary and capricious standard. *See Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) (addressing Clean Water Act claims); *Nw. Env'tl Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997) (addressing NEPA claims).

## III

[1] The permit at the center of this dispute was issued by the Corps pursuant to Section 404 of the CWA, 33 U.S.C. § 1344, which authorizes the Corps to issue permits for the discharge of dredged or fill material into the navigable waters

---

[4]The June 8, 2007 opinion stated that "the draft EA was distributed to the agencies involved and distributed on the web." In fact, none of the parties claim that a draft EA was circulated before the second PEDD and the EA were complete. This was corrected in the amended opinion.

of the United States if certain conditions are met. 33 U.S.C. § 1344(d). "The Section 404 permit process is governed simultaneously by Corps Regulations, 33 C.F.R. Parts 320-29, and by EPA guidelines, 40 C.F.R. Part 230. Both sets of rules must be observed." *Hintz*, 800 F.2d at 829.

**[2]** The Section 404 permitting process is also governed by NEPA. NEPA was enacted in pursuit of two objectives: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat'l Res. Def. Coun., Inc.*, 462 U.S. 87, 97 (1983) (internal citations and quotation marks omitted). Unlike the CWA, NEPA does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). Judicial review of agency decision-making under NEPA is limited to the question of whether the agency took a "hard look" at the proposed action as required by a strict reading of NEPA's procedural requirements. *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001).

## IV

We first address BSC's claims under the CWA.

### A

#### 1

**[3]** A key issue under the CWA presented by BSC is whether the Corps adequately considered practicable alternatives to the Rock Creek Mining Project design that was ultimately approved. 40 C.F.R. § 230.10(a) provides that "no discharge of dredged or fill material shall be permitted if there

is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." A practicable alternative is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* "In evaluating whether a given alternative site is practicable, the Corps may legitimately consider such facts as cost to the applicant and logistics. In addition, the Corps has a duty to consider the applicant's purpose." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989) (citation omitted).

**[4]** Where a proposed project does not require access to water, i.e., it is not "water dependent," the availability of practicable alternatives is presumed. 40 C.F.R. § 230.10(a)(3). The parties agree that the Rock Creek Mining Project is not water dependent.

**[5]** The record shows that the Corps extensively and properly considered alternatives to the design of the Rock Creek Mining Project that was ultimately approved. The PEDD reflects the Corps consideration of 24 different alternatives, including different placements of the mine pits and related facilities, alternative designs for the pits and tailings storage facilities, "co-disposal" of tailings and development rock together, and relocation of access roads. After extensive consultation with AGC, the Corps determined that all alternatives were impracticable because the nearby uplands were too steep to stabilize the facilities, because the alternative designs would require the destruction of higher value wetlands, or would expand the project's footprint, or because alternatives were cost prohibitive or undesirable for other reasons. This rationale is acceptable under the CWA.

BSC challenges this result on several bases. First, BSC argues that the Corps failed to apply the correct presumption of practicable alternatives for projects that are not water

dependant. However, the PEDD reflects that the Corps explicitly concluded that the project "is not a water dependant activity" and that therefore "pursuant to 40 C.F.R. 230.10(a)(3), practicable alternatives not involving special aquatic sites are presumed to be available." The Corps applied the proper presumption.

Second, BSC argues that the Corps improperly rejected all possible upland relocation options for the individual mine facilities by evaluating only an "all uplands" alternative, i.e., the placement of the entire project in uplands, without considering the relocation of individual facilities. Specifically, BSC argues that the Corps failed to consider the option of relocating only the North waste dump at the Rock Creek Mine/Mill site to an upland site. In support of this claim, BSC cites to the PEDD's rejection of an alternative design that would place all facilities in uplands and claims that the Corps failed to consider the relocation of some, but not all, of the facilities.

[6] This is incorrect. The Corps considered and rejected the "all uplands" alternative but, contrary to BSC's assertion, that was not the only alternative design considered. Although the PEDD does not discuss the relocation of the north dump alone, it reflects the Corps consideration of 24 different design alternatives. "While an argument can be made that one of these sites was suitable, it would not be appropriate for [the Court] to overturn the Corps' contrary finding."[5] *Hintz*, 800 F.2d at 834. The PEDD also reflects the Corps' careful review of the data collected by AGC's consultants before the Corps

---

[5]Similar analysis applies to BSC's claim that the Corps improperly rejected a "dry stack" tailings facility as cost prohibitive. The record shows that the Corps considered the four alternatives presented by AGC's consultants in a "Tailings Alternative Report," which were incorporated by reference in the PEDD. *See Hintz*, 800 F.2d at 834 ("The Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA."). The Corps concluded, in agreement with the Tailings Alternative Report, that the dry stack method was prohibited by costs.

issued the permit, and the PEDD notes that representatives from AGC discussed alternative sites with the Corps and/or state officials on at least 59 occasions. The Corps reasonably reviewed the feasible options and reasonably concluded that the proposed design was the best design alternative.

**2**

**[7]** BSC next argues that the Corps did not properly weigh the public interest as required by 33 C.F.R. § 320.4(b)(4). That section provides that "[n]o permit will be granted . . . unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource." *Id.* Paragraph (a) of § 320.4 includes factors to be considered, including, without limitation:

> conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

*Id.*

**[8]** BSC's argument is unavailing. The PEDD reviews many relevant factors under 33 C.F.R. § 320.4(a) in a discussion spanning more than twenty pages. In addition to the significant environmental considerations included in the PEDD, the Corps also properly considered the significant economic benefits that are expected to result from the project. Given the relatively poor condition of the local economy in relation to the state overall, we agree that these benefits are weighty in this case. BSC may disagree with the Corps' determination,

but in making that determination the Corps did not arbitrarily or capriciously evaluate the public's interest.

**B**

**[9]** In a related claim under the CWA, BSC argues that the Corps did not properly consider whether the Rock Creek Mining Project would "cause or contribute to significant degradation of the waters of the United States" as required by 40 C.F.R. § 230.10. Under this section, the Corps is directed to consider the effects of the project while placing "special emphasis on the persistence and permanence of the effects" of the project.[6] Much briefing on this issue relates to the substantive merits of the Corps' scientific and factual conclusions on the ecological effects of the project. However, the issues properly considered here are whether the Corps' "decision [to issue the permit] was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Nat'l Res. Council,* 490 U.S. 360 (1989).

---

[6]"Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values." 40 C.F.R. § 230.10(c).

**[10]** We conclude that the Corps acted properly. The PEDD demonstrates that the Corps correctly considered a variety of impacts from the project, and determined that the impacts would be localized or limited in time. Moreover, the Corps stressed that the wetlands that would be filled during the project are not unique to the site, and that the USFWS has determined that wetlands of the type filled in this project are the "common habitat in the Alaska and the Nome region," exceeding forty percent of the land in the State of Alaska. Accordingly, the Corps concluded that the Project will likely have no impact on the greater ecosystem beyond the project site. Because the Corps thoroughly and rationally considered the relevant factors under 40 C.F.R. § 230.10, it cannot be said that its determination was arbitrary and capricious, or that its conclusion was contrary to law.

BSC contends that the Corps has not adequately evaluated the hydrological impacts of the project, which it claims may violate § 401 of the Clean Water Act, 33 U.S.C. § 1341. However, under 33 C.F.R. § 320.4(d) the Corps may accept a certification of compliance with § 401 from the relevant state authority in lieu of conducting its own independent analysis. This certification was issued by Alaska's Department of Environmental Conservation on August 9, 2006. Although BSC argues that the Alaska Department of Environmental Conservation's certification does not include consideration of the underground injection system to be used at the site, the certification mentions that system, and the Alaska Department of Environmental Conservation was aware of it when issuing the certification. Under the Corps' regulations, the certification is conclusive with respect to water quality considerations. *Hintz*, 800 F.2d at 834. The Corps was not required to undertake the additional analysis that BSC raises, and in any case the Corps included a sufficient discussion of water quality effects in the PEDD. The Corps' determination that the Rock Creek Mining Project would not "cause or contribute to significant degradation of the waters of the United States" was neither arbitrary and capricious, nor contrary to law.

## C

**[11]** BSC next argues that the Corps did not require the appropriate mitigation measures required by the CWA. 40 C.F.R. § 230.10 requires that the Corps include "appropriate and practicable" mitigation measures in permits issued under § 404 of the CWA. 40 C.F.R. § 230.10(d); *see also* 33 C.F.R. § 320.4(r) (explaining the general mitigation policy).

**[12]** BSC contends that the Corps did not implement all of the mitigation measures suggested by the EPA. However, the record demonstrates that "the Corps considered [EPA's] initial concerns, addressed them, and explained why it found them unpersuasive." *Cal. Trout v. Schaefer*, 58 F.3d 469, 475 (9th Cir. 1995) (internal quotation marks and citation omitted). The Corps implemented all of the EPA's concrete conditions in the permit and rejected only the more general statements from EPA, the substance of which were addressed elsewhere in the PEDD. The permit includes an array of required mitigation measures, and the Corps has explained its rejection of the other measures considered.

BSC also contends that the mitigation measures provided in the permit are insufficient because some mitigation measures have not been fully developed. Specifically, BSC urges that the permit condition requiring that AGC meet with the Corps and USFWS within three months of permit issuance to identify additional mitigation opportunities shows that the Corps has not fully developed the required mitigation plan for the project.

We have not squarely addressed the question of whether plans to develop additional mitigation measures in the future can satisfy the CWA's mitigation requirements. However, in a related context, we have held that prospective mitigation plans satisfied NEPA's mitigation requirements where the plans were "developed to a reasonable degree." *Wetlands Action Network v. U.S. Army Corps of Eng'r*, 222 F.3d 1105,

1121 (9th Cir. 2000); *see also Tillamook County v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) (holding that the Corps "was not required [under NEPA] to develop a complete mitigation plan detailing the precise nature of the mitigation measures nor were the measures required to completely compensate for adverse environmental impacts.") (internal quotation marks omitted).

**[13]** The mitigation measures contained in the permit here satisfy the CWA's mitigation requirements. The mitigation measures that are to be developed after permit issuance are only one part of the overall mitigation requirements included in the permit. Where the Corps has undertaken a genuine effort to develop a detailed mitigation plan, the mere fact that one aspect of the plan is not yet finalized will not necessarily lead to the conclusion that the Corps' decision was arbitrary and capricious. Also, the USFWS, not the Corps, suggested that the mitigation measures be developed after the permit was issued. This belies any suggestion that the Corps was attempting to skirt its responsibilities under the CWA by delaying the development of a mitigation plan. *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352-53 (1989) ("it would be incongruous to conclude that the Forest Service has no power to act until the local agencies have reached a final conclusion on what mitigating measures they consider necessary."). Finally, the Corps may be perfectly reasonable in its belief that additional on-site mitigation opportunities will present themselves once the project is underway. That the Corps intends to pursue additional mitigation opportunities at a later time does not conflict with the requirements of the CWA unless the mitigation measures that have been fully developed are inadequate. We conclude that the Corps' decisions regarding mitigation measures were not arbitrary and capricious, and complied fully with law.[7]

---

[7]BSC makes much of a February 6, 1990 Memorandum of Agreement between EPA and the Corps that discusses the mitigation requirements of

## V

We next address BSC's claims under NEPA.

## A

**[14]** BSC argues that the Corps did not provide adequate public notice and comment under NEPA because it did not circulate a draft EA before the final EA was completed. BSC claims that a draft EA must be circulated in order for the Corps to comply with 40 C.F.R. § 1501, which requires the Corps to "involve environmental agencies, applicants, and the public, to the extent practicable" in the preparation of the EA. The Corps and AGC argue in response that NEPA does not require the circulation of a draft EA.

---

the CWA at length. BSC emphasizes language in the memorandum stating that mitigation measures should provide, "at a minimum, one for one functional replacement (i.e. no net loss of values)" to satisfy the requirements of the CWA. *See generally* Memorandum of Agreement Between The Department of the Army and The Environmental Protection Agency, The Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, Sept. 6, 1990, *available at* http://www.epa.gov/owow/wetlands/regs/mitigate.html (last accessed Dec. 20, 2007). However, as the Corps and AGC point out, the 1990 memorandum is modified by a May 13, 1994 memorandum that recognizes that one for one replacement of wetlands may be impracticable in Alaska, where "there is a high proportion of land in a watershed or region which is wetlands." Accordingly, "emphasis is placed on minimizing project impacts to wetlands by reducing the footprint of the project, using co-location of facilities whenever possible, and seeking to locate the project in lower value wetlands." The memorandum notes, "In Alaska, minimization of impacts has been in many circumstances the only mitigation required." *See* Alaska Wetlands Initiative Summary Report, May 13, 1994, *available at* http://www.epa.gov/owow/wetlands/pdf/alask.pdf (last accessed Dec. 20, 2007). The record demonstrates that the Corps minimized the project footprint by considering a range of alternative placements, and considered (and implemented) additional mitigation options. Given the high percentage of land proximate to the development that is wetlands, we cannot say that the Corps' approach to minimize impact by selecting low value wetlands for project use is unreasonable.

Our law currently does not make clear whether NEPA requires the circulation of a draft EA. The regulations do not answer the question. 40 C.F.R. § 1503.1 requires the circulation of a draft EIS, but does not speak to the necessity of a draft EA. 40 C.F.R. § 1506.6 requires that agencies "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures[,]" but does not expressly require the circulation of a draft EA.

Nor does current Ninth Circuit case law decide the question. In *Anderson v. Evans*, we stated that "[t]he public must be given an opportunity to comment on draft EAs and EISs, and public hearings are encouraged to facilitate input on the evaluation of proposed actions." 371 F.3d 475, 487 (9th Cir. 2004). However, the dispute in *Anderson* concerned whether the government was required to prepare an EIS, not whether there was adequate public notice and comment on the EA—in fact, a draft EA was circulated in *Anderson*. The statement in *Anderson* about the circulation of a draft EA is a dictum.

In other Ninth Circuit cases we have held that the Ninth Circuit has "not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003). The *Citizens for Better Forestry* opinion quotes *Anderson* for the proposition that a draft EA must be circulated, but the decision itself relies not on *Anderson*'s dictum, but rather on the fact that the public was given no notice of the preparation of the EA at all. *See id.* at 970 ("It is evident, therefore, that a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations.") This case presents the first opportunity for us to squarely address the question in a case where the issue is presented.

**[15]** We hold today that the circulation of a draft EA is not required in every case. We do not say that it is always

required or that it is never required. Instead, we stress that the regulations governing public involvement in the preparation of EAs are general in approach, *see* 40 C.F.R. § 1506.6, requiring the circulation of a draft EA in every case would apply a level of particularity to the EA process that is foreign to the regulations. Also, requiring the circulation of a draft EA in every case could require the reversal of permitting decisions where a draft EA was not circulated even though the permitting agency actively sought and achieved public participation through other means. The regulations do not compel such formality. *See* 40 C.F.R. § 1508.9.

Our conclusion is consistent with the views of other circuits, which uniformly have not insisted on the circulation of a draft EA. *See Alliance To Protect Nantucket Sound, Inc. v. U.S. Dept. of Army*, 398 F.3d 105, 114-115 (1st Cir. 2005) (concluding that "[n]othing in the CEQ regulations requires circulation of a draft EA for public comment, except under certain 'limited circumstances,' " and rejecting *Anderson*'s contrary language as dicta); *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1240 (2d Cir. 2002) (holding that a draft EA must be circulated only in certain limited circumstances); *Greater Yellowstone Coalition v. Flowers,* 359 F.3d 1257, 1279 (10th Cir. 2004) ("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS."); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 548 (11th Cir. 1996) ("[T]here is no legal requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are.").[8]

However, a significant question remains. Given our conclusion that NEPA does not always require the circulation of a draft EA, what level of public disclosure is required under

---

[8]One district court in our circuit has commented that an "agency can never go wrong by releasing a draft EA, and supporting documents," *Sierra Nev. Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005).

NEPA before issuance of a final EA? Each EA will be prepared under different circumstances, and the regulations have not specified a formal practice for affected agencies. For this reason, practices have not been uniform, and so we will elaborate the factors that should guide the agency. In *Sierra Nevada Forest Protection Campaign v. Weingardt*, 376 F. Supp. 2d at 991-92, the United States District Court for the Eastern District of California considered precisely this issue. After concluding that the agency (there the United States Forest Service) need not circulate a draft EA, the court explained:

> [the regulations] require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA. Depending on the circumstances, the agency could provide adequate information through public meetings or by a reasonably thorough scoping notice.

*Id.* at 991.

**[16]** The district court in *Sierra Nevada Forest Protection Campaign* evaluated this issue soundly, and we commend its approach. As that court observed, "The way in which the information is provided is less important than that a sufficient amount of environmental information—as much as practicable—be provided so that a member of the public can weigh in on the significant decisions that the agency will make in preparing the EA." *Id.* Stated another way, we now adopt this rule: An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.

**[17]** The Corps satisfied this rule here. Information about the project was widely disseminated throughout the commu-

nity and environmental information was reasonably and thoroughly tendered to the public. Indeed, in response, the Corps received a high level of public comment from the Nome community, most of it favoring the project. In addition to these significant efforts by the Corps, AGC made substantial efforts to provide additional information to the public, including a weekly newspaper column on the project's status that ran for about eighteen months, local presentations, radio interviews, and joint efforts with state agencies to explain the permitting process. The quality of the Corps' dissemination of environmental information to the public and its consideration of public comment, before issuing its EA, was reasonable and adequate.

**B**

BSC next argues that the EA prepared by the Corps for the Rock Creek Mining Project is inadequate by four different measures. First, BSC argues that the EA did not adequately discuss cumulative impacts. Second, BSC argues that the alternatives analysis in the EA is inadequate. Third, BSC argues that the Corps reliance on mitigation plans that are not yet fully developed is inadequate. Finally, BSC argues that the Corps failed to adequately analyze environmental impacts in the EA.

"NEPA requires that an EIS be prepared for all 'major Federal actions significantly affecting the quality of the human environment.' 42 U.S.C.A. § 4332(2)(C) (1994). However, if, as here, an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether the action will have a significant effect on the environment." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). The EA is designed to provide sufficient evidence and analysis for the agency to determine whether to prepare an EIS or to issue a FONSI. *Id.* at 1145; *see also* 40 C.F.R. § 1508.9 (describing the purposes of the EA). Here,

the Corps determined on the basis of the EA that an EIS was unnecessary, and BSC challenges the sufficiency of the EA.

**1**

**[18]** BSC contends that the EA did not adequately discuss the cumulative impact of the project. "Cumulative impact" is defined in the regulations as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. We have held that:

> [a] proper consideration of the cumulative impacts of a project requires some quantified or detailed information . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided. The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Mng't,* 387 F.3d 989, 993-94 (9th Cir. 2004) (internal quotation marks and citation omitted).

BSC relies on *Klamath-Siskiyou* to support its argument. In *Klamath-Siskiyou*, the plaintiffs challenged the adequacy of EAs prepared by the Bureau of Land Management for timber sales in the Oregon Cascades. *Id.* at 992. Although that agency had received applications for four timber sales in the same area, it decided to review the four sales with separate EAs. *Id.* We reversed the district court's judgment for the agency, concluding that two of the EAs failed to adequately consider the cumulative impacts of the four different projects. *Id.* at 994-6. Although the EAs contained lengthy sections

labeled "cumulated impacts," the discussion was primarily limited to the impacts of the individual project covered by each EA, with little discussion of the effects of the four sales combined. *Id.* We held that "the only mention of cumulative effects in the two EAs comes in the form of generalized conclusory statements that the effects are not significant or will be effectively mitigated." *Id.* at 996. These were the type of "[g]eneral statements about possible effects and some risk [that] do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* at 995 (citing *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)).

[19] The EA here succinctly but adequately discusses the cumulative impacts of the project and points out the Corps' determination that the project will leave portions of the drainage in "more natural conditions than currently exist" due to mitigation measures included in the permit. To be sure, the EA does not discuss at length other projects taking place in the Nome region. However, the record indicates—and we were assured at oral argument—that this is because there are no projects of similar magnitude at this time. Also, BSC has pointed to no past, present, or reasonably foreseeable future projects comparable in environmental impact to the Rock Creek Mine Project. This fairly distinguishes *Klamath-Siskiyou*, because there the agency failed to consider four known and comparable projects that were proceeding in the permitting process. *Compare Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1123 (9th Cir. 2002) (noting that the Corps need not include projects in its cumulative impacts analysis that are highly speculative). The Corps also considered the cumulative impact of placer mining in the region. In our view, the impact of the isolated, small-scale placer mining that exists in the Nome region today is not germane to the cumulative impacts assessment of the large-scale hard rock mining project at issue here. In addition, we understand that reclamation is required at the end of placer mining projects. *See* Alaska Stat. § 27.19.020. Because nearly all of the Nome

district has been previously mined, much of it prior to the introduction of reclamation requirements, any new placer mining projects will result in remediation of historic mining impacts. BSC has not identified any comparable project— past, present, or future— that could call into question the cumulative impacts analysis. Under the total circumstances, we conclude that the Corps' cumulative impacts analysis was adequate.

**2**

**[20]** BSC next argues that the EA does not adequately discuss alternatives to the approved project as required by NEPA regulations found at 40 C.F.R. § 1508.9. It is important to recognize that NEPA's requirement to assess alternatives, unlike that in the CWA, is a procedural and not a substantive requirement. Our law has made clear the nature of NEPA's scope: "Under NEPA, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative. An agency need not, therefore, discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area[.]" *Northern Alaska Env'l Center v. Kempthorne,* 457 F.3d 969, 978 (9th Cir. 2006) (quotation marks and internal citations omitted).[9]

**[21]** We have already concluded above, in assessing the CWA claim, that the Corps considered many alternatives and satisfied its obligation to select the least environmentally damaging practicable alternative. The CWA analysis is primarily (but not exclusively) concerned with the aquatic ecosystem, 40 C.F.R. § 230.10(a)(2), while the NEPA analysis is more broad and procedurally oriented. However, the

---

[9]"[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Env'l Prot. Info. Ctr. v. U.S. Forest Service,* 451 F.3d 1005, 1016 (9th Cir. 2006).

Corps has satisfied both standards with its comprehensive, searching, and rational assessment of alternatives. We conclude that the Corps took the "hard look" required by NEPA.

**3**

BSC next contends that the mitigation plans contained in the EA are inadequate because the EA relies on plans that are to be fully developed after the project begins. "An agency's decision to forego issuing an EIS may be justified by the presence of mitigating measures." *Wetlands Action Network*, 222 F.3d at 1121. However, we have held that an "agency is not required to develop a complete mitigation plan detailing the precise nature . . . of the mitigation measures[,]" so long as the measures are "developed to a reasonable degree." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001). As discussed more thoroughly in Section C, above, the mitigation plans that have not yet been fully developed are only a small part of the overall mitigation plan for the Rock Creek Mine Project site, on which we conclude that mitigation measures were developed to a reasonable degree. Because the measures overall are developed to a reasonable degree, the Corps could reasonably conclude that additional mitigation measures would be developed after work commenced at the site.

**4**

[22] Finally, BSC argues that the Corps did not adequately consider the environmental impacts of the Rock Creek Mine Project in the EA. BSC first contends that the 2007 EA does not discuss air quality issues. This is incorrect. The EA requires that AGC develop a plan with the Alaska Department of Transportation to minimize dust, the primary air contaminant to be released from the site. The Environmental Information Document, incorporated by reference in the EA, also includes specific data on the air quality issues at the site, and concludes that there are none that are significant.

**[23]** BSC then asserts that the Corps failed to adequately address water quality issues. However, as discussed in our analysis of the CWA issues above, the Corps was entitled to rely upon the certification from the Alaska Department of Environmental Conservation that the project meets the relevant water quality conditions. Moreover, the Corps considered water quality issues at length, partly in response to comments from EPA, and the Environmental Information Document, incorporated by reference in the EA, discussed water quality issues, including an in-depth analysis of groundwater issues.

**[24]** BSC further contends that the EA did not adequately consider the impact of the project on biological resources. This is also incorrect. The EA and accompanying Environmental Information Document include detailed habitat mapping to determine the wildlife use patterns within the project area. The Corps determined that the mine would likely cause short-term disruption of wildlife in the area, but that "wildlife typically adjusts to this type of disturbance by moving to nearby undisturbed areas where similar habitat types exist." Because the Corps found that more than 54,000 acres of similar habitat surround the Rock Creek Mine/Mill and Big Hurrah Mine, the Corps concluded that the impacts on wildlife would be minimal.

**[25]** The Corps adequately considered the environmental impacts raised by BSC, its conclusions were not arbitrary and capricious, nor were they contrary to law.

**C**

**[26]** BSC argues that the Corps should have prepared an EIS for the Rock Creek Mine Project. "NEPA requires that an [EIS] be prepared for all 'major Federal actions significantly affecting the quality of the human environment.' 42 U.S.C.A. § 4332(2)(C)." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 730. To determine whether an EIS is necessary,

an EA is prepared.[10] Based on the EA, the agency determines whether an EIS should be prepared or a FONSI should be issued. "An EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.' " *Blue Mtns.*, 61 F.3d at 1212 (citation omitted). "Whether there may be a significant effect on the environment requires consideration of two broad factors: context and intensity." *Ctr. for Bio. Diversity v. NHTSA*, Nos. 06-71891, 06-72317, 06-72641, 06-72694, 06-73807, 06-73826, 2007 WL 3378240, at * 5 (9th Cir. Nov. 15, 2007) (citing *Nat'l Parks & Conservation Ass'n*, 241 F.3d 720, 731 (9th Cir. 2001)); *see also Ctr. for Bio. Diversity*, at *5 (listing additional relevant factors).

BSC raises issues that it believes demonstrate "substantial questions" about the effects of the Rock Creek Mine Project. First, BSC raises concerns about air quality, biological resources, and water quality. The EA and accompanying Environmental Information Document show that the Corps undertook a reasonable approach to these issues. "Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

Second, BSC argues that EPA's disagreement with the Corps regarding mitigation requirements raises a substantial question that requires the preparation of an EIS. However, the EPA's objections were limited to the propriety of issuing the permit while some details of the mitigation plan were not finalized. The Corps reasonably developed a mitigation plan, including many measures that are set, and has provided a reasoned explanation for these post-issuance conditions, which were suggested by the USFWS. That EPA disagreed with the Corps' assessment does not create a substantial issue requir-

---

[10]"Significantly" is defined in 40 C.F.R. § 1508.27.

ing an EIS under these circumstances. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 368.

**[27]** We cannot avoid perceiving that the project in its required mitigation favorably affects parts of the Nome area that suffered environmental damage from previously unconstrained resource development. On balance, we conclude that the Rock Creek Mine Project has no significant detrimental effect on the environment in and near Nome. Accordingly, the Corps was not required to prepare an EIS based on the issues raised by BSC or by the EPA.

## VI

The decisions of the Corps relating to the Rock Creek Mining Project were not arbitrary and capricious. Nor were these decisions contrary to law.

**AFFIRMED.**