*1195 FISHER, Circuit Judge,
dissenting in part:
I respectfully dissent from Judge Reinhardt’s holding on the NFMA claim.
Introduction
The National Forest Management Act (NFMA)
sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. Procedurally, the NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest Service is required to use “a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences.” Id. § 1604(b). After a forest plan is developed, all subsequent agency action ... must comply with the NFMA and be consistent with the governing forest plan. Id. § 1604(i).
Lands Council, 537 F.3d at 988-89. NFMA requires the Secretary of the Interior to promulgate regulations for resource management addressing numerous concerns, including providing “for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives,” 16 U.S.C. § 1604(g)(3)(B), and permitting “increases in harvest levels based on intensified management practices,” id. § 1604(g)(3)(D).
The 1982 Rule — an implementing regulation I discuss at length below — states in part,
Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.
36 C.F.R. § 219.19 (1983). To that end, the Rule requires selection of management indicator species (“MIS”); statement of planning alternatives in terms of habitat and population trends; interagency consultation concerning MIS; consideration of the effects of visitor usage, pests and fire management on wildlife; monitoring of MIS and preservation of habitat critical to threatened or endangered species. See id. § 219.19(a)(l)-(7).
A. Ripeness
The Forest Service first attacks Sierra Forest’s NFMA challenge as unripe. When assessing ripeness, we must consider: “(1) whether delayed review would cause hardship to the plaintiffs[,] (2) whether judicial intervention would inappropriately interfere with further administrative action[ ] and (3) whether the courts would benefit from further factual development of the issues presented.” Ohio Forestry Ass’n, 523 U.S. at 733, 118 S.Ct. 1665; see also Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (reasoning that ripeness prevents premature adjudication and entanglement in abstract policy disagreements and insulates administrative decisionmaking until policies are concretely applied), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 104, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Applying these guidelines, Ohio Forestry Association squarely held that a facial NFMA attack on an LRMP such as the 2004 *1196 Framework, outside of the context of a concrete project or application, is unripe. See 523 U.S. at 732-37, 118 S.Ct. 1665. If “plaintiffs allege that the Forest Service’s general methodology ... in the Forest Plan was flawed, causing site-specific harm,” however, their claim is ripe for review. Wilderness Soc’y v. Thomas, 188 F.3d 1130, 1134 (9th Cir.1999) (emphasis added); see also Ohio Forestry Ass’n, 523 U.S. at 734, 118 S.Ct. 1665 (noting the availability of a later challenge to an LRMP “if (but only if) the present Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm from logging”). Moreover, if “the site-specific injury ... is alleged to have been caused by a defect in the Forest Plan,[a court] may consider whether the Forest Service complied with the Act in making its general ... determinations in the Forest Plan.” Wilderness Soc’y, 188 F.3d at 1134; see also Sierra Club v. Peterson, 228 F.3d 559, 570-72 (5th Cir.2000) (en banc) (Higginbotham, J., concurring) (“Once the plaintiff identifies a sale, it can then direct the court’s attention to those steps leading up to and including the sale’s implementation that render the sale illegal.”).
Contrary to Sierra Forest’s assertions, the Basin Project does not uniformly “open[ ] the door to[Sierra Forest’s] broader challenge to the 2004 Framework[ ].” Unlike allegations needed to establish standing, the mere fact that a plaintiff has identified site-specific sales in its pleadings does not permit a programmatic challenge under NFMA. See, e.g., Sierra Club v. Peterson, 228 F.3d at 567. A site-specific project will implement only portions of an LRMP, so a facial challenge to all aspects of the framework would require us to continue to assess aspects of the LRMP in the abstract. This would make Ohio Forestry Association a source of delay with little practical benefit. However, to the extent that the Basin Project threatens species viability precisely because of flaws in the 2004 Framework, a NFMA challenge to those programmatic flaws is ripe for adjudication. Moreover, we must consider environmental degradation in the Basin Project in a cumulative context in order to preclude a death by a thousand cuts.
In sum, Sierra Forest’s facial NFMA claim against the 2004 Framework is not ripe for adjudication (and never will be). Sierra Forest may, however, challenge shortcomings in the 2004 Framework to the extent they cause site-specific harm through implementation in the Basin Project. The parties do not dispute that Sierra Forest’s NFMA challenge to the Basin Project is ripe.
B. Basin Project: Species Monitoring
Sierra Forest argues that the Basin Project falls short of species monitoring required at the project level by the 2004 Framework. See Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1175 (9th Cir.2006) (requiring project-level monitoring, even under the 2000 Transition Rule, because the 2004 Framework “expressly require[d] ‘population monitoring’ ” of the species at issue), abrogated on other grounds by Winter, 129 S.Ct. at 375; see also 16 U.S.C. § 1604(i) (requiring site-specific projects to comply with the existing LRMP). However, in 2007, the Forest Service amended the monitoring requirements of the 2004 Framework. The Forest Service argues that no inconsistency remains between the amended 2004 Framework and the Basin Project’s species monitoring provisions.
The 2007 Amendment specifies that “[o]ngoing monitoring of the selected species identified in [the 2004 Framework] will not be changed in this decision.” Nor does the 2007 Amendment “drop the adaptive management approach developed in the” 2004 Framework.' The 2007 *1197 Amendment, however, requires “monitoring of MIS population trends and determining relationships to habitat changes at the planning-area scale during forest plan implementation” and eliminates species “monitoring requirements in the project area or at the project level.” “The sole MIS requirement that is applied at the project-level is the assessment of habitat for” monitoring indicator species. The Amendment is expressly retroactive.
Sierra Forest does not contend that the Basin Project is inconsistent with the habitat monitoring provisions of the 2007 Amendment. Rather, it argues that the Forest Service is precluded from applying the 2007 Amendment retroactively. In Friends of Southeast’s Future v. Morrison, 153 F.3d 1059, 1070 (9th Cir.1998), we addressed a forest plan amendment that purported, in part, to remove certain analytical requirements prior to approving a timber sale. We rejected the amendment’s retroactivity provision, holding that “agency authority to change the legal consequences of completed acts only exists if Congress conveys such authority in an ‘express statutory grant.’ ” Id. (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)); see also Landgraf v. USI Film Prods., 511 U.S. 244, 272, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (holding that “prospectivity remains the appropriate default rule” in statutory interpretation and requiring “clear congressional intent” for retroactive application); Southiuest Ctr. for Biological Diversity v. U.S. Dep’t of Agric., 314 F.3d 1060, 1062 (9th Cir.2002) (permitting application of legislation to a suit pending at the time of enactment only because the statute did not retroactively affect past action).
The Forest Service argued in Morrison that § 1604® of NFMA authorized retroactive application of the amendment, but we disagreed:
The Forest Service contends that such a grant of authority is contained in 16 U.S.C. § 1604®, which provides that “instruments for the use and occupancy of National Forest System lands ... currently in existence shall be revised as soon as practicable to be made consistent with [LRMPs.]” However, by its plain language, this provision only applies to the revision of instruments to achieve consistency with forest plans, not to the revision of the forest plans themselves.
Morrison, 153 F.3d at 1070.[10] That holding does not preclude the Forest Service’s argument in this case that a different NFMA provision — § 1604(f)(4) — does provide the requisite express authority to apply the 2007 Amendment retroactively here. I respectfully disagree with Judge Reinhardt’s reading of Morrison as going beyond the merits of the statutory argument made to that panel, to announce a blanket interpretation of the whole of NFMA.
*1198 United States v. Contreras (Contreras II), 593 F.3d 1135 (9th Cir.2010) (en banc) (per curiam), which Judge Reinhardt also invokes, is not to the contrary. There, the three-judge panel had interpreted the same provision of the Sentencing Guidelines, but gave a new interpretation to the same language and purported to expressly overrule prior cases. See id. at 1136. Nothing in Contreras II, or in Miller v. Gammie, 335 F.3d 889 (9th Cir.2003) (en banc), precludes us from distinguishing a previous panel ruling based on a principled reading of the prior panel’s articulated holding. The importance of imposing reasonable limits on the precedential value of related decisions becomes evident when one considers the text of § 1604(f)(4) on its face:
Plans developed in accordance with this section shall ... be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.
§ 1604(f)(4) (emphasis added). The term “in any manner whatsoever” logically includes “in a retroactive manner.” We have held that clear statement rules can be satisfied through similar general statements; “magic words” need not be invoked. Alaska v. EEOC, 564 F.3d 1062, 1066-67 (9th Cir.2009) (en banc); see also Bugenig v. Hoopa Valley Tribe, 229 F.3d 1210, 1219 (9th Cir.2000) (holding that a “ ‘notwithstanding proviso,’ which is an easily invoked, Court-approved ‘gold standard’ for delegation,” is an “express” delegation sufficient to meet a clear statement rule).
Contrary to Judge Reinhardt’s assertion, it is unremarkable to speak of an action being taken in a retroactive “manner.” Maldonado-Galindo v. Gonzales, 456 F.3d 1064, 1067 (9th Cir.2006) (“Congress need not use a set phrase to indicate when a statute is to be given retroactive effect; rather, the statute need only evince Congress’s ‘clear intent’ that legislation apply in a retroactive manner.”). See Eastern Enters. v. Apfel, 524 U.S. 498, 524, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (“legislation operates in a retroactive manner”); Harper v. Va. Dep’t of Taxation, 509 U.S. 86, 110, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (Kennedy, J., concurring in part) (“applied in a retroactive manner”); SEC v. Gemstar TV Guide Int’l, Inc., 367 F.3d 1087, 1088 (9th Cir.2004) (“operates in an unconstitutionally retroactive manner”); Home Loan Bank Bd. v. Mallonee, 196 F.2d 336, 370 (9th Cir.1952) (“amendments operated in this retroactive manner”); see also Garcia-Ramirez v. Gonzales, 423 F.3d 935, 952 n. 5 (9th Cir. 2005) (Gould, J., concurring) (“operate in an impermissibly retroactive manner”) (paraphrasing Velasquez-Gabriel v. Crocetti, 263 F.3d 102, 108 (4th Cir.2001)).
These citations show that “manner” need not mean “process,” and if Congress meant process then it could have said so. Congress chose the phrase “any manner whatsoever,” which connotes broad authority. See United States v. Yoshida, 303 F.3d 1145, 1152 (9th Cir.2002) (“The statute itself conclusively indicates that Congress intended a broad definition of bring: ‘brings to or attempts to bring to the United States in any manner whatsoever.’”) (quoting 8 U.S.C. § 1324(a)(2) (emphasis added)). Judge Reinhardt’s attempt to exclude the effect of an amendment from the Forest Service’s authority to amend in any manner whatsoever is unpersuasive.
Further, nothing about § 1604 generally, or § 1604(f)(4) specifically, suggests that the “manner” of amendment is a procedural formality. First, we have previ *1199 ously held that § 1604(f)(4) is a broad grant of power to the agency. See Lands Council v. Martin, 529 F.3d 1219, 1227-28 (9th Cir.2008) (holding that Forest Service could amend a LRMP in a limited manner thereby avoiding a “significant” amendment, which would have required “a lengthy and detailed amendment process”). That Lands Council focused on procedure is unsurprising because that was that nature of the appellant’s argument. See id. In Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir.1997) (per curiam), we had previously agreed that § 1604(f)(4) gave the Forest Service authority to choose whether amendments would have prospective or retrospective effect. See id. at 1312-13 (“Congress intended to grant the Secretary discretion in amending existing forest plans, including the discretion to determine how those amendments will be implemented.”). Although Forest Guardians did not expressly hold that amendments could be applied in a retroactive manner, it clearly implied as much.
Second, the context of § 1604(f)(4) is not limited to process. In § 1604(f)(4) itself, the second clause requires significant amendments to adhere to the requirements of § 1604(e), which enforces the substantive requirements of the Multiple-Use Sustained-Yield Act of 1960,16 U.S.C. §§ 528-531.[11] Similarly, the rest of § 1604 is a mixture of substance and process, addressing the life cycle of LRMPs, from development criteria, see § 1604(b), to public participation, see § 1604(d), to directives for substantive regulations, see § 1604(g), to effective dates and applying revised forest plans, see § 1604(i) & (j). Judge Reinhardt’s assertion that somehow retroactive amendment is incompatible with that list is not persuasive.
I would hold that the 2007 Amendment governs Sierra Forest’s NFMA claim that the Basin Project is inconsistent with project-level species monitoring provisions found in the 2004 Framework. Sierra Forest does not contest that any inconsistency exists between the Basin Project and the 2007 Amendment project-level monitoring requirements. Any inconsistency between the Basin Project and the unamended 2004 Framework is moot. I would therefore affirm the district court’s denial of Sierra Forest’s site-specific NFMA monitoring claim.
C. 2004 Framework: Species Viability
My conclusion that the Basin Project is consistent with the forest plan leads me to disagree with Judge Reinhardt’s conclusion that Sierra Forest’s challenge to the 2004 Framework as applied in the Basin Project is not ripe. Sierra Forest’s framework-level NFMA claim is premised on application of the 1982 Rule, 36 C.F.R *1200 § 219.19 (1982), the restrictive regulation I described above, to the 2004 Framework. Before advancing to the substance of Sierra Forest’s claim, I must first assess the extent to which that decades-old provision continues to govern LRMPs.
The transitional provisions of the 2000 Rule (the “2000 Transition Rule”) govern the revision and amendment of LRMPs by the Forest Service. See 36 C.F.R. § 219.35 (2009); see also National Forest System Land and Resource Management Planning, 74 Fed.Reg. 67059-01, 67060 (Dec. 18, 2009) (noting that the 2000 Transition Rule remains in place pursuant to an injunction). Under the 2000 Transition Rule, “a responsible official may elect to continue or to initiate new plan amendments or revisions under the 1982 [Rule].” 36 C.F.R. § 219.35(b); see also Citizens for Better Forestry v. U.S. Dep’t of Agric., 341 F.3d 961, 965-68 (9th Cir.2003) (explaining development of the 2000 Rule and the role of its transition provisions); 74 Fed.Reg. at 67060 (explaining that all substantive NFMA regulations concerning LRMPs since the 1982 Rule have been superseded or enjoined). The Forest Service promulgated the 2004 Framework using the 1982 Rule and does not challenge its applicability in this suit. Moreover, in a separate suit we specifically held that the 2004 Framework is governed by the 1982 Rule under the 2000 Transition Rule. See Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1174 (9th Cir.2006), abrogated on other grounds by Winter, 129 S.Ct. at 375. Therefore, I proceed on the assumption the 1982 Rule applies here.
The procedural impediments and regulatory amendments described in Parts A and B, supra, whittle away Sierra Forest’s NFMA claims to one narrow issue: whether the 2004 Framework violates NFMA and causes harm through implementation in the Basin Project. Specifically, Sierra Forest contends that the 2004 Framework fails to ensure compliance with its own adaptive management goals, violating the 1982 Rule’s requirements concerning species viability. At the project level, Sierra Forest argues that the Basin Project exemplifies a broader failure to conduct MIS monitoring necessary for a rigorous adaptive management compliance mechanism. Because the Chief of the Forest Service concluded that “managing habitat to maintain viable populations of the California spotted owl, the Pacific fisher, and the American marten can only be assured by using subsequent site-specific evaluations and the adaptive management and monitoring strategy,” the Forest Service has conceded that the 2004 Framework’s NFMA compliance is contingent on “a treatment, feedback, and adjustment system to carefully manage risks to habitats.”
As a preliminary matter, NFMA requires sufficient disclosure for a court to be able to “ascertain from the record that the Forest Service is in compliance” with the statute and regulations. Native Ecosystems Council v. U.S. Forest Service, 418 F.3d 953, 963 (9th Cir.2005). In response to the Chiefs prioritization of adaptive management, the Regional Forester published a 10-page supplemental adaptive management -and monitoring strategy setting a review and feedback process and establishing research questions concerning old forest species. This plan provides adequate assurances that adaptive management will occur, fulfilling NFMA’s disclosure requirement.
Sierra Forest urges that adaptive monitoring is ineffective without fixed guidelines concerning “when or how the 2004 Framework will be altered if monitoring reveals that the plan is impacting old forest wildlife.” However, the fixed regime that Sierra Forest demands would eliminate use of new information learned through management, undermining the ba *1201 sic premise of adaptive management. The formal outline of adaptive management goes one step further than mere notice that “a monitoring plan will be developed and implemented through an iterative process,” which a district court has found insufficient to satisfy NFMA. Western Watersheds Project v. U.S. Forest Serv., No. 05-189, 2006 WL 292010, at *10 (D.Idaho Feb. 7, 2006). Sierra Forest also urges that “quantified objectives and required mitigation measures” are required, based on Natural Resources Defense Council v. Kempthorne, 506 F.Supp.2d 322 (E.D.Cal.2007). However, Kempthome applied the ESA, which contains the more stringent requirement that mitigation measures are “certain to occur.” Id. at 350, 356; see also Animal Welfare Inst. v. Beech Ridge Energy LLC, 675 F.Supp.2d 540, 580 (D.Md.2009) (finding that “entirely discretionary adaptive management” is insufficient to eliminate impermissible risk under the ESA). No such certainty is required under NFMA unless and until species viability is threatened. According to the Chief Forester, monitoring and adaptive management provide an “assurance” that management under the 2004 Framework will not reach a point where species viability is threatened at the framework level, although if adaptive management were ineffective, long-term viability would not be assured.
The remaining question is whether the Basin Project demonstrates that monitoring necessary to adaptive management will not be carried out in the absence of more enforceable guidelines. Sierra Forest contends that this case is “identical” to Earth Island Institute v. U.S. Forest Service, 442 F.3d at 1173-76. In Earth Island Institute, we addressed two forest restoration projects undertaken pursuant to the El Dorado National Forest LRMP, which is in turn subject to the 2004 Framework. See id. at 1153-54. Earth Island alleged that the projects violated NFMA by failing to monitor two native bird species that the 2004 Framework expressly subjected to “population monitoring.” See id. at 1173, 1175. We held that reliance on stale monitoring data without “current or accurate field studies” or a factual basis for determinations of critical habitat levels constituted arbitrary and capricious action under NFMA. Id. at 1175-76.
The crucial distinction between Earth Island Institute and the instant case is that there is no indication that — at least at the project level — habitat monitoring is insufficient to provide needed information for adaptive monitoring. Although the 2004 Framework, through adoption of 2001 Framework MIS rules, originally “allow[ed] for a very limited degree of habitat monitoring in lieu of actual population monitoring,” id. at 1173, the 2007 Amendment shifted project-level monitoring to a habitat model. The 2007 Amendment also reduced the list of MIS to those species subject to “[pjroven monitoring protocols” and whose “population changes are believed to indicate the effects of land management activities.”
Although the 2007 Amendment continues to list the California spotted owl and American marten as MIS, it does not require monitoring of fisher or northern goshawk populations. A high level of uncertainty concerning the effects of management or existing population trends for these two species reasonably eliminates them from use as indicators of forest health, but the elimination of those species as MIS generates concerns regarding the ability of the 2004 Framework adaptive monitoring protocols to protect their viability, as required by NFMA. Cf. Native Ecosystems Council v. Tidwell, 599 F.3d 926, 933 (9th Cir.2010) (requiring particular scrutiny for reliability and accuracy when the Forest Service engages in proxy-based monitoring). On *1202 the other hand, the 2004 Framework SEIS indicates that the fisher and northern goshawk share habitat preferences with the California spotted owl and marten, requiring large trees, canopy cover, snags and coarse, woody debris. Most importantly, the 2004 Framework continues to require population monitoring at the framework level, which is the level at which the 1982 Rule continues to apply. Because adaptive management is “an area involving a high level of technical expertise,” a court must defer to the agency’s determination of the amount of monitoring necessary to support that policy, so long as some firm commitment is made. Therefore, the adaptive monitoring protocols contained in the 2004 Framework are sufficient to protect species viability, as required by NFMA and the 1982 Rule.
For the foregoing reasons, I respectfully dissent on the resolution of the NFMA claim and would affirm the district court.

. Section 1604(i) states in full:
(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision
Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.
16 U.S.C. § 1604(i).

. The Multiple-Use Sustained-Yield Act requires:
[M]anagement of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.
16 U.S.C. § 531(a), and
the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.
16 U.S.C. § 531(b).