**CENTER FOR BIOLOGICAL DIVERSITY and Earth Island Institute, Plaintiffs,**

v.

**Dean GOULD, Sierra National Forest Supervisor; and United States Forest Service, Defendants.**

**Sierra Forest Products, Defendant-Intervenor.**

**CIV. NO. 1:15-01329 WBS GSA**

United States District Court, E.D. California.

Signed December 11, 2015

Filed 12/14/2015

Anchun Jean Su, Justin John Augustine, Oakland, CA, for Plaintiffs.

Jared S. Pettinato, United States Department of Justice, Washington, DC, Julie S. Thrower, U.S. Department of Justice, San Francisco, CA, for Defendants.

Lawson Fite, PHV, American Forest Resource Council, Portland, OR, Thomas

C. Brodersen, Williams, Brodersen & Pritchett LLP, Visalia, CA, for Defendant-Intervenor.

## MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

Plaintiffs Center for Biological Diversity and Earth Island Institute brought this action against defendants Dean Gould, the Sierra National Forest Supervisor, and the United States Forest Service ("Forest Service"), alleging that defendants violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") in approving the French Fire Recovery and Reforestation Project ("French Fire Project"). Sierra Forest Products intervened as a defendant. Pursuant to Federal Rule of Civil Procedure 56, plaintiffs and defendants both move for summary judgment.

## I. Factual and Procedural Background

Plaintiff Center for Biological Diversity is a non-profit corporation involved in species and habitat protection issues throughout North America. (Compl. ¶ 10.) Plaintiff Earth Island Institute is a non-profit organization headquartered in Berkeley, California whose purpose is to develop and support projects that counteract threats to biological and cultural diversity. (Id. ¶ 12.) One of Earth Island Institute's projects, the John Muir Project, was formed to protect all public forestlands from commercial exploitation that undermines science-based ecological management. (Id.)

Defendant Forest Service, an agency of the Department of Agriculture, is responsible for the administration and management of the federal lands at issue in this case. (Id. at 6.) Defendant Dean Gould is the Forest Supervisor for the Sierra National Forest and is being sued in his official capacity. (Id.) Defendant-intervenor Sierra Forest Products contracted with the Forest Service to purchase thirteen million board feet of lumber that will be harvested as part of the French Fire Project. (Duysen Decl. ¶ 13 (Docket No. 26).)

The French Fire Project encompasses 13,832 acres of the Bass Lake Ranger District, Sierra National Forest in North Fork, California that were impacted by the July 2014 French Fire. (Admin. R. ("AR") at 11.) According to the Forest Service, the objectives of the French Fire Project are to reforest the area, manage wildfire fuels, make the area safer from falling dead or damaged trees, maintain defensive fuel profile zones for fighting future wildfires, provide wildlife habitat, reduce soil erosion, protect a powerline from future wildfire, eradicate invasive weeds, and provide jobs and valuable raw materials for the economy. (AR at 15.) The project authorizes the treatment and logging of 5,965 acres—half of the total affected fire area. This includes the removal and sale of fire-affected trees on 3,371 acres. (Id. at 16.)

In their Complaint, plaintiffs allege the French Fire Project will log over 1,000 acres of roadless areas that could become designated as wilderness areas under the Wilderness Act of 1964, 16 U.S.C. § 1131 ("Wilderness Act"), and provide important habitat for imperiled species, such as the black-backed woodpecker, California spotted owl, and Pacific fisher. (Compl. ¶¶ 30-31.) Plaintiffs claim defendants violated NEPA and the APA by failing to disclose, and invite public comment regarding, the French Fire Project's impacts on roadless areas before issuing a final decision; failing to make the Wilderness Resource Impact Analysis available for public comment; failing to take a "hard look" at the vast impacts on roadless areas in their Wilderness

Resource Impact Analysis; and failing to prepare an Environmental Impact Statement. (Id. ¶¶ 44-62.)

On October 20, 2015, plaintiffs filed this motion for summary judgment on their NEPA and APA claims. (Docket No. 30–1.) Plaintiffs request the court to vacate the Environmental Assessment ("EA") and Decision Notice and Finding of No Significant Impact ("DN/FONSI") and remand to the agency for consideration of the French Fire Project's impacts on roadless areas. Plaintiffs request the court vacate the DN's authorization of logging within the roadless areas. On October 30, 2015, defendants Forest Service and Gould filed a cross-motion for summary judgment. (Forest Serv.'s Mem. (Docket No. 35–1).) On November 4, 2015, defendant-intervenor Sierra Forest Products also filed a cross-motion for summary judgment. (Docket No. 36.)

## II. Discussion

### A. Standing

■ Defendants do not argue that plaintiffs lack standing. Chad Hanson is the director and staff ecologist of the John Muir Project, a project of the Earth Island Institute, and also a member of the Center for Biological Diversity. (Hanson Decl. ¶ 3 (Docket No. 30–3).) He states in his declaration that he regularly visits post-fire habitat areas of the Sierra Nevada for his research and recreation. (Id. ¶ 5.) He visited areas of the Sierra National Forest impacted by the French Fire in the spring of 2015 and plans to return around April 12, 2016. (Id. ¶ 7.) His ability to do research in large, unlogged areas will be diminished by the logging and treatment, as will his ability to enjoy the wild character and aesthetics of the area. (Id. ¶ 9.) Similarly, Douglas Bevington, a member of the Center for Biological Diversity, has visited the Sierra National Forest to bird-watch and plans to visit the roadless areas where the French Fire occurred on June 8, 2016. (Bevington Decl. ¶¶ 2-5.) He explains that he will be personally affected by the French Fire Project logging as it will scar the area aesthetically and reduce his ability to see wildlife, such as the black-backed woodpecker, in the burned roadless areas. (Id. ¶ 7.) These facts are sufficient to confer standing on plaintiffs to bring this suit. See Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 859–62 (9th Cir.2005) (discussing standing requirements in the context of suit under NEPA).

### B. Summary Judgment

[2–4] Judicial review of actions by administrative agencies is governed by the APA. Under the APA, the reviewing court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "deferential standard... designed to ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir.2001) (citation omitted). An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. (citation omitted). The court must ask whether an agency considered "the relevant factors and articulated a rational connection between the facts found and the choice made." Nat'l Res. Def. Council v. U.S. Dep't of the Interior, 113

F.3d 1121, 1124 (9th Cir.1997) (citation omitted).

■ The court is not empowered to substitute its judgment for that of an agency. Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1236 (9th Cir.2001) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The court defers to an agency's "interpretation of its own regulations ... unless plainly erroneous or inconsistent with the regulations being interpreted." Ctr. for Biological Diversity v. U.S. Forest Serv., 706 F.3d 1085, 1090 (9th Cir.2013) (citation omitted). Moreover, the court should review an agency's actions based on the administrative record presented by the agency. See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006). The court's role on motions for summary judgment is not to resolve contested fact questions which may exist in the underlying administrative record, but "to determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." Nehemiah Corp. v. Jackson, 546 F.Supp.2d 830, 838 (E.D.Cal.2008); see also Occidental Eng'g, Co. v. INS, 753 F.2d 766, 769–70 (9th Cir.1985).

## C. Statutory Framework

■ NEPA is "our basic national charter for protection of the environment ... [i]t establishes policy, sets goals ... and provides means for carrying out the policy." 40 C.F.R. § 1500.1(a). NEPA "does not set out substantive environmental standards, but instead establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir.2000) (citations omitted).

Through the Wilderness Act of 1964, Congress created the National Wilderness Preservation System to provide protection for lands relatively untouched by human activity. See 16 U.S.C. §§ 1131-36; Nat'l Audubon Soc'y v. Forest Serv., 46 F.3d 1437, 1440 (9th Cir.1993). The Wilderness Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain ... undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1331(c). The Act seeks to protect and manage land that:

(1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

Id. The Wilderness Act put in place a process under which the Forest Service, in order to aid Congress in designating "wilderness," reviews "primitive" areas of the national forests to determine their "suitability or nonsuitability for preservation as wilderness." Id. § 1132(b).

In 2012, the Forest Service issued the National Forest System Planning Rule ("2012 Planning Rule") to guide "the development, amendment, and revision of land management plans for all units of the National Forest System (NFS)." 77 Fed. Reg. § 21162-01. The 2012 Planning Rule provides that "in developing a proposed new plan or proposed plan revision" the Forest Service must "[i]dentify and evaluate lands

that may be suitable for inclusion in the National Wilderness Preservation System and determine whether to recommend any such lands for wilderness designation." 36 C.F.R. § 219.7(c)(2)(v). The Sierra National Forest is an early adopter of the 2012 Planning Rule and, as a result, is currently revising its Forest Plan and compiling an inventory of lands that may be suitable for inclusion in the National Wilderness Preservation System. (Burkindine Decl. ¶¶ 1–3 (Docket No. 34–4).)

### D. Analysis of the French Fire Project's Impact on Roadless Areas

Plaintiffs challenge whether the Forest Service conducted a proper analysis of the French Fire Project's impact on roadless areas that could potentially be classified as wilderness. Plaintiffs argue that three Ninth Circuit cases, Lands Council v. Martin, 529 F.3d 1219 (9th Cir.2008); Smith v. Forest Serv., 33 F.3d 1072 (9th Cir.1994), and National Audubon Society v. Forest Service, 46 F.3d 1437 (9th Cir.1993), require the Forest Service to make a public disclosure in its NEPA documents if a project will impact a 5,000 acre roadless area—even if the area has not been designated as wilderness land and does not qualify for future designation under the current regulations. Further, the cases require the consideration of the unique attributes of roadless areas.

In Smith, the Ninth Circuit held that the Forest Service's "obligation to take a 'hard look' at the environmental consequences of the proposed sale and consider a no-action alternative require[d] it, at the very least, to acknowledge the existence of the 5,000 acre roadless area." 33 F.3d at 1079. The Forest Service had authorized the harvest and sale of timber in the Colville National Forest on 6,000 roadless acres—4,246 of which were uninventoried and 2,000 of which were inventoried as released for

non-wilderness use. Id. at 1074, 1077. This land did not qualify for wilderness classification under the Wilderness Act because a portion of the land was inventoried and the remainder was smaller than 5,000 acres.

Nevertheless, the Ninth Circuit held that the Forest Service had an obligation to acknowledge the existence of the 5,000 acre roadless area because " 'the decision to harvest timber on a previously undeveloped tract of land is an irreversible and irretrievable decision which could have serious environmental consequences.' " Id. at 1078 (quoting Audubon, 46 F.3d at 1448). While the Forest Service argued that roadless character is "merely a synonym for specific environmental resources, including soil quality, water quality, vegetation, wildlife and fishery resources, recreational value, and scenic quality"—all of which were addressed in its EA—the Ninth Circuit made clear that addressing the impact on these resources in the logging area is not sufficient. Id. The NEPA documents failed to consider "the remaining thousands of acres of roadless land ... that will no longer be part of a 5,000 acre roadless expanse." Id. The Ninth Circuit explained that while this land did not qualify as wilderness under current regulations, it is possible the "wilderness option for inventoried lands may be revisited in second-generation Forest Plans." Id. at 1078. The "possibility of future wilderness classification triggers, at the very least, an obligation on the part of the agency to disclose the fact that development will affect a 5,000 acre roadless area," even if the Forest Service is under no obligation to preserve this land. Id.

Similarly, in Martin, the Ninth Circuit found that the Forest Service's EIS did not comply with the requirements of Smith because the roadless areas impacted by a post-fire logging project were not "discussed in the context of their potential for

wilderness designation." 529 F.3d at 1230. Nowhere in the EIS did the Forest Service disclose that logging would occur on 1,000 roadless acres of uninventoried land that were contiguous to an inventoried roadless area of 12,000 acres. Id. at 1232. Neither did it acknowledge that another logging area was of sufficient size as to make practicable its preservation and use in an unimpaired condition. Id. This, the court found, failed to "meet even the bare minimum requirement discussed in Smith" of disclosure and analysis in the broader context of contiguous land. Id.

In this case, the Forest Service issued a draft EA on May 7, 2015, which contained no overt discussion of roadless or wilderness areas. In response, plaintiffs submitted a comment letter noting that it had "identified two uninventoried roadless areas (both over 5,000 acres—see attached map) in the project area, and both have proposed logging units within them." (AR at 3199.) Plaintiffs emphasized that the draft EA failed to disclose or "analyze the impacts and cumulative effects of logging these areas ... with regard to future Wilderness designation—and the loss of ability to qualify as Wilderness if these areas are logged" and an EIS needed to be prepared. (Id.) The map submitted by plaintiffs was prepared by the Center for Biological Diversity's Geographic Information Systems ("GIS") specialist, Curtis Bradley, (Bradley Decl. ¶¶ 2-3 (Docket No. 30–6)), and allegedly demonstrates that over 1,000 acres of the French Fire's logging falls within roadless areas of 5,000 acres or more that could someday be designated as wilderness. (AR at 3816.) Plaintiffs created this map by determining "all Forest Service lands that were further than 100 meters from a road in order to focus on roadless areas and to avoid roadside hazard treatments." (Bradley Decl. ¶ 5.)

In response to plaintiffs' comment letter and map, the Forest Service prepared a Wilderness Resource Impact Analysis ("Wilderness Analysis") that analyzed the effects of the Project on future potential wilderness areas. (AR at 2206.) In assessing the potential wilderness impact, the Forest Service relied on final inventory maps that had been prepared as part of the separate inventory revision process under the 2012 Planning Rule. (Id.) As discussed above, in implementing the 2012 Planning Rule, the Forest Service is required to "identify all lands in the plan area that may have wilderness characteristics as defined in the Wilderness Act." (Id.) While plaintiffs are correct that these maps are not yet final since the public comment process is ongoing, the court disagrees that it was "premature" for the Forest Service to rely on these maps. (Pls.' Mem. at 14.) The inventory maps are the Forest Service's current best assessment of which land may qualify for wilderness classification and they have been made available to the public for review and comment as part of the 2012 Planning Rule process. (Burkindine Decl. ¶¶ 9-11.)

Contrary to the plaintiffs' findings, the Forest Service's inventory maps suggest that only "142 acres of inventoried potential wilderness acres overlap Project treatment units." (AR at 2210.) To conduct its inventory, the Forest Service excluded all lands "less than half a mile across between roads, because they are not of sufficient size as to make practicable their preservation and use in unimpaired condition." (Id. at 2218.) The Forest Service used these road buffers to bound areas into polygons that could be considered for potential wilderness values. (Burkindine Decl. ¶ 3.) The Forest Service also removed transmission and powerline corridors from the inventory since the areas do not have wilderness characteristics and it was likely that utility companies would need to develop an ac-

cess road to the areas in the future. (Id. ¶ 4.) The Forest Service created a one-half mile buffer around these areas because it "concluded that people within one-half mile could likely see and hear signs of human mechanized activities, and those sights and sounds would degrade the wilderness experience." (Id. ¶ 5.) Lastly, the Forest Service excluded narrow strips of land between roads that would not exhibit wilderness character. (Id. ¶ 6.)

Plaintiffs argue that the Forest Service's half-mile buffer is arbitrary as it is not found anywhere in Chapter 70 of the Forest Service Land Management Planning Handbook. See FSH 1909.12, Chapter 70. However, plaintiffs' 100-yard buffer is also not dictated by the handbook. Given the highly deferential standard of review under the APA, the court must find that the Forest Service's calculation of 142 acres, rather than plaintiffs' 1,000 acres, is reasonable. The Forest Service explains its rationale for the inventorying method and there appears to be a rational connection between the facts found while inventorying the French Fire Project area and the conclusions regarding wilderness designation. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (citation omitted).

The Forest Service's Wilderness Analysis explains that it is not likely to consider for wilderness inclusion in the Forest Plan Revision under the 2012 Planning Rule the 142 acre portion of the polygons that overlap with French Fire Project treatment units, "because the two polygons either lack of wilderness character, are not man-

ageable, or both." (AR at 2210.) The Forest Service concluded that the wilderness character of this land has been compromised by human manipulation from defensive fuel profile zones, regular plantation planting patterns, and proximity to roads associated with motorized use. (Id. at 2215–16.) Moreover, the Forest Service found that "even if the larger areas were subsequently found to have the requisite wilderness characteristics in the future, any resulting wilderness recommendation could redraw the proposed wilderness boundaries to excise the 142 acres treated with no loss to the remaining area's wilderness potential." (Id. at 2216–17.)

The Ninth Circuit cases, therefore, are distinguishable from this case because the French Fire Project does not involve an "irreversible and irretrievable decision which could have serious environmental impacts." Audubon, 46 F.3d 1437, 1448 (9th Cir.1993) (citation omitted). A disclosure of the roadless character was not necessary because, unlike in Smith and Martin, the treatment of the 142 acre area will not disqualify the surrounding land from designation as wilderness in the future. Moreover, as directed by the Ninth Circuit, the Forest Service considered the French Fire Project in the context of the greater "roadless expanse," Martin, 529 F.3d at 1231, and concluded that the impacted acres could easily be excised from the broader areas of national forest lands. The French Fire Project will not destroy the possibility of future wilderness designation. In addition, though the Wilderness Analysis did not explicitly discuss the French Fire Project's impact on a 5,000 acre roadless area, it thoroughly considered the possibility of future wilderness designation. The court therefore finds that the Forest Service both considered the area's potential for future wilderness designation and com-

plied with Ninth Circuit precedent.[1]

### E. Opportunity for Public Comment on Potential Impact on Wilderness and Roadless Areas

■ Under NEPA, the agency "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1. In preparing an EA, "the agency shall involve environmental agencies, applicants, and the public, to the extent practicable." Id. § 1501.4(b). Determining whether the public was adequately involved is "a fact-intensive inquiry made on a case-by-case basis." Natural Res. Def. Council, Inc. v. U.S. Forest Serv., 634 F.Supp.2d 1045, 1067 (E.D.Cal.2007) (citation omitted).

■ Although the Ninth Circuit has "not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process, [it] clearly [has] held that the regulations at issue must mean something." Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961, 970 (9th Cir.2003) ("[A] complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations."); see also Sierra Nev. Forest Prot. Campaign v. Weingardt, 376 F.Supp.2d 984, 991 (E.D.Cal.2005) (Levi, J.) ("The way in which the information is provided is less important than that a sufficient

amount of environmental information—as much as practicable—be provided so that a member of the public can weigh in on the significant decisions that the agency will make."). "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 953 (9th Cir.2008).

In Weingardt, the court found that the Forest Service "failed to give the public an adequate pre-decisional opportunity for informed comment" where it distributed a scoping letter but no draft EA. 376 F.Supp.2d at 992.[2] While the court explained that, "depending on the circumstances, the agency could provide adequate information through public meetings or by a reasonably thorough scoping notice," it found that the Forest Service had not released "sufficient environmental information about the various topics" addressed in the EA prior to its finalization. Id. For example, the scoping notice provided no environmental data concerning impacts to wildlife, cultural resources, watersheds, soils, fisheries, or aquatics. Id. Further, it provided no discussion of the potential cumulative effects that were discussed in the final EA. Id.

---

**1.** Defendants also argue that "[e]ven if National Audubon, Smith, or Martin had recognized some free-floating requirement to analyze 'uninventoried roadless areas,' which they did not, the 2012 Planning Rule makes those cases obsolete" because the new regulation only requires analysis of areas that may have wilderness characteristics, not roadless areas. (Forest Serv.'s Mem. at 12.) However, the Ninth Circuit cases require disclosure of roadless areas, even if the roadless areas do not qualify for wilderness designation under

the current regulations. As a result, this is not a prevailing argument and the court does not find that the 2012 Planning Rule rendered National Audubon, Smith, or Martin obsolete.

**2.** This decision was cited with approval by the Ninth Circuit in Bering Strait, 524 F.3d at 953 ("The district court in Sierra Nevada Forest Protection Campaign [v. Weingardt] evaluated this issue soundly, and we commend its approach.").

In this case, the Forest Service had two distinct comment periods: thirty days following both the scoping notice and the draft EA. (AR at 1153, 1118.) The scoping process included a public meeting and publication of a project description and two maps of the French Fire Project. Neither map, however, identified roadless areas or areas with potential for future wilderness designation.[3] (Id. at 6124, 6313–14, 6324.) The draft EA also contained no discussion whatsoever of roadless areas or wilderness designation. Further, neither the scoping notice nor the draft EA published the inventory maps created for the 2012 Planning Rule process or revealed that the Forest Service would rely on the inventory maps in assessing wilderness potential.

The Wilderness Analysis, which was published on the same day as the final EA and DN/FONSI, was the first Forest Service document to explicitly address potential wilderness designation. It was in this document that the Forest Service revealed that it was relying on the inventory maps, 142 acres of potential wilderness area would be impacted by the French Fire Project, and the 142 acres were not likely to be designated as wilderness. There was no opportunity for public comment on the Wilderness Analysis.

Defendants argue that though the Forest Service did not specifically identify roadless areas or potential wilderness areas in its scoping notice or draft EA, the Forest Service provided the public with the tools necessary to analyze these issues during the comment periods. (Forest Serv.'s Mem. at 15.) This is made clear, defendants argue, by plaintiffs' comment letter, which relied on the information provided and identified that logging might impact possible wilderness areas. (Id.)

While plaintiffs were able to deduce from the scoping notice and draft EA that the French Fire Project may impact wilderness areas, other members of the public might have weighed in had the issue been explicitly raised in either the scoping notice or draft EA. Moreover, plaintiffs would have been able to submit a more complete comment if they had access to the information in the Wilderness Analysis. Cf. Sequoia ForestKeeper v. Elliott, 50 F.Supp.3d 1371, 1388 (E.D.Cal.2014) (Ishii, J.) ("[A] court reviewing an agency decision under NEPA can only provide relief to a challenging party if it can be shown that information that was not before the agency would, if properly considered, present a seriously different picture of the environmental landscape.") (citation omitted).

Plaintiffs specifically identify several important pieces of information they would have presented to the Forest Service if they had been given an opportunity to comment on the Wilderness Analysis. First, plaintiffs argue that if they had known the Forest Service would rely on the inventory maps, they would have had a GIS expert analyze the inventory maps to verify or discredit the Forest Service's assertions. (Pl.'s Reply & Opp'n at 7 (Docket No. 38).) It is possible that this analysis would have revealed new information or called into question the Forest Service's assessment of the area. While the inventory maps were publicly available, it was unreasonable to expect the plaintiffs or other members of the public to predict

---

**3.** The first map attached to the scoping notice shows the location of the French Fire, the borders of the surrounding national parks, wilderness boundaries, and main highways. (AR at 6314.) The second map is zoomed in on the French Fire area and highlights the areas identified for plantation analysis, Medusahead analysis, powerline buffer analysis, defensive fuel profile zone buffer analysis, hazard tree salvage analysis, and potential treatment units. (Id. at 6324.)

that the inventory maps, created for an entirely separate purpose, would be relied upon in analyzing the French Fire Project. Second, plaintiffs would have provided pictures and videos of the area to challenge the Forest Service's finding that specific areas lacked wilderness potential. (Id.) Lastly, plaintiffs argue they would have been better able to challenge the Forest Service's wilderness assessment and articulate why it did not comply with applicable law. (Id.) Specifically, plaintiffs would have attacked the criteria the Forest Service used for creating buffer zones, assessing powerline corridors, and assessing areas with signs of fire suppression actions. (Pls.' Mem. at 16.)

While there is no established minimum requirement for involving the public in the Ninth Circuit, the court finds that the Forest Service did not provide adequate pre-decisional opportunity for public comment on its Wilderness Analysis. The Forest Service did not provide the public with the environmental information regarding wilderness designation that it needed to weigh in with their views and inform the agency decision-making process. See Weingardt, 376 F.Supp.2d at 992; Bering Strait, 524 F.3d at 953. Accordingly, the court grants plaintiffs' motion for summary judgment on the issue of public comment and denies defendants' motion. The Forest Service must provide a public opportunity to comment on the Wilderness Analysis and respond to comments received.[4]

F. Necessity of an EIS

Plaintiffs next challenge the decision of the Forest Service not to prepare an EIS for the French Fire Project. The relevant provision of NEPA provides that "all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on (i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). "Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS." Ocean Advocates, 402 F.3d at 864. If, after preparation of the EA, the agency decides not to prepare an EIS, it must put forth a "convincing statement of reasons that explain why the project will impact the environment no more than insignificantly." Id. (citation omitted); see also 40 C.F.R. § 1508.13 (listing requirements for a FONSI). The FONSI is crucial to a court's evaluation of whether the agency took the requisite "hard look" at the potential impact of a project. Ocean Advocates, 402 F.3d at 864.

To prevail on a claim seeking an EIS, a plaintiff "need not demonstrate that significant effects will occur. A showing that there are substantial questions whether a project may have a significant effect on the environment is sufficient." Anderson v. Evans, 371 F.3d 475, 488 (9th Cir.2002) (citation omitted). The NEPA implementing regulations promulgated by the Council on Environmental Quality

---

4. Allowing additional time for public comment will not unduly burden defendants. Sierra Forest Products has informed the court that it has suspended logging operations due to weather. (Joint Status Report at 2 (Docket No. 43).) If the winter brings dry conditions, Sierra Forest Products may be able to resume operations in January or February 2016. However, if there are wet conditions, operations will not resume until July 1, 2016 because the French Fire Project guidelines prohibit logging from March 1, 2016 through June 30, 2016. (Id.)

("CEQ") provide that "significantly as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. Courts evaluate intensity, which "refers to the severity of impact," by considering a number of factors. Id. § 1508.27(b). "[O]ne of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." Ocean Advocates, 402 F.3d at 865.

Plaintiffs argue that an EIS was required based on the following four intensity factors: (1) unique characteristics of the geographic area; (2) degree to which the effects on the quality of the human environment are likely to be highly controversial; (3) the degree to which the possible effects involve unique risk; and (4) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. Further, plaintiffs argue defendants failed to provide a convincing statement of reasons for failing to conduct an EIS.

### a. Unique Characteristics of the Geographic Area

Even if Smith, Martin, and Audubon were not distinguishable from this case, the logging of a roadless area does not automatically require an EIS analysis. Smith makes clear that while logging roadless areas "could have serious environmental consequences," an "EIS may not be per se required under such circumstances." 33 F.3d at 1078–79 (citation omitted). In fact, though the Ninth Circuit held that the Forest Service's NEPA documents were insufficient in Smith, the court let the agency decide how best to comply with NEPA and its implementing regulations. Id. at 1079.

In this case, the Forest Service found that the impact of the French Fire Project on any future potential wilderness designation would be negligible. In its final DN/FONSI, the Forest Service wrote that:

> The Project does occur on approximately 142 acres within polygons inventoried for potential wilderness designation as part of the Sierra NF plan revision process. An analysis was done on these impacts and the character of the area, and it was determined that the area lacks the requisite wilderness character for designation. Therefore the Project will not affect an area with unique characteristics (French Fire Recovery and Restoration Project Wilderness Resource Impact Analysis, 8/26/2015). Based on that evidence, it is not reasonably foreseeable and it is not likely that the SNF will designate as potential wilderness any areas that the French Project affects.

(AR at 34.) This portion of the DN/FONSI directly addresses why the French Fire Project will not impact an area with unique characteristics. The court therefore finds that an EA was adequate and the agency's FONSI was not arbitrary and capricious.

### b. Degree to Which the Effects Are Likely to Be Highly Controversial

"A federal action is controversial if a substantial dispute exists as to its size, nature or effect." Wetlands Action Network v. Army Corps of Eng'rs, 222 F.3d 1105, 1122 (9th Cir.2000), abrogated on other grounds by Wilderness Soc. v. Forest Service, 630 F.3d 1173 (9th Cir. 2011) (citation omitted). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 736 (9th Cir.2001) (citation omitted). Once this evidence is presented to the agency, the agency has the burden of demonstrating why this evidence does not cre-

ate a controversy. Id. "The existence of opposition to a use, however, does not render an action controversial." Wetlands Action Network, 222 F.3d at 1122.

■■■■ Plaintiffs argue that this action is controversial because there is a substantial dispute as to the size of the roadless areas with potential for wilderness designation that will be impacted. (Pls.' Mem. at 18.) While the court agrees that this was a significant dispute earlier in the process, the Forest Service specifically addressed these concerns by issuing a Wilderness Analysis that explains the government's findings, the maps it relied on, and the manner in which the maps were created. (AR at 2206-10, 2211-15, 2218.) NEPA requires only a " 'reasonably thorough' discussion of the environmental consequences in question, not unanimity of opinion, expert or otherwise." City of Carmel–By–The–Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1150–51 (9th Cir.1997). Moreover, "when faced with conflicting evidence an agency may rely on its own evidence." Id. at 1151. Accordingly, plaintiffs' argument that an EIS was required because there was a substantial dispute as to the size of the federal action fails.

c. Degree to Which the Possible Effects Involve Unique Risk

The French Fire Project does not involve unique risk even though certain roadless areas will be logged, see supra Part II.E.

d. Degree to Which the Action May Establish a Precedent

■■■■ Plaintiffs argue that the Forest Service was required to prepare an EIS because the French Fire Project sets a negative precedent for future actions with significant effects as it will allow the Forest Service to unilaterally determine, without public input, the areas that are roadless and suitable for wilderness designation. (Pls.' Mem. at 19.) The French Fire Project will not set a negative precedent because, as is explained in the Wilderness Analysis and final EA, there are no significant effects from the treatment and logging in this case. Moreover, the Forest Service did not act unilaterally but rather sought public comment both during the scoping period and after issuing a draft EA. Accordingly, the court denies plaintiffs' motion and grant defendants' on plaintiffs' NEPA claim that an EIS was required.

G. Adequacy of the Forest Service's DN/FONSI

■■■ As discussed above, if any agency decides not to prepare an EIS, it must put forth a "convincing statement of reasons [in the form of a FONSI] that explain why the project will impact the environment no more than insignificantly." Ocean Advocates, 402 F.3d at 864 (citation omitted). The Forest Service sufficiently addressed the factors that go toward a court's determination of whether a project may have significant effects in its DN/FONSI and Wilderness Analysis. (See AR at 34-35.)

For all of the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED to the extent that the Forest Service is hereby ORDERED not to resume the logging of roadless areas in the French Fire Project unless and until it complies with the requirements of NEPA by providing a public opportunity to comment on the Wilderness Analysis and responding to comments received. In all other respects, plaintiffs' motion is DENIED and defendants' motion is GRANTED.